[No. 8,004.—Department One.]
Jan. 19, 1882.

## THE CENTRAL PACIFIC RAILROAD COMPANY v. THE STATE BOARD OF EQUALIZATION.

Taxation—Assessment—Railroad Companies—Mortgage—Constitutional Law.—Under the Constitution of this State, the property of railroad and other *quasi* public corporations is subject to assessment and taxation, without deduction of the amount of any mortgage or like lien thereon.

Id.—Id.—Id.—Id.—Id.—This provision is not in conflict with the Fourteenth Amendment to the Constitution of the United States. The provision of that section, that no State shall "deny to any person within its jurisdiction the equal protection of the laws," applies to natural persons only, and does not apply to corporations, or artificial persons.

Id.—Id.—Id.—Id.—Id.—Person—Definition.—Section 9 of Article xiii of the Constitution (relating to the equalization of county assessment rolls), has no relation to the assessments of the property of railroad corporations operated in more than one county.

Id.—Id.—Id.—Franchise—Constitutional Law.—The franchise of the Central Pacific Railroad Company is property subject to taxation; and is not exempt from taxation by reason of its being a means or instrumentality employed by Congress to carry into operation the powers of the general Government.

Application for writ of *certiorari*.

*Creed Haymond,* for Plaintiff.

The whole of the road within this State has, by the respondents, been assessed to the petitioner. This constitutes one of our objections to the actions of the State Board. The new Constitution of California, in language so clear and explicit that it admits of no question, declares, without exception, that "a mortgage, deed of trust, contract, or other obligation by which a debt is secured, shall, for the purposes of

assessment and taxation, be deemed and treated as an interest in the property affected thereby." (§ 4, Art. xiii.)

With the expediency of this provision the judicial department can not deal. The power which made it was alone competent to determine its wisdom. The Court, in the construction of the language, will not be at a loss. It would seem difficult to substitute words more intelligible or less liable to misconstruction. "A mortgage * * * shall, for the purposes of assessment and taxation, be treated as an interest in the property affected thereby." These are the words. Their purpose and object was to change (for the purpose of taxation) the familiar rule of law existing in this State that a mortgage should not be deemed and treated as an interest in the property affected thereby.

The "Pacific Railroad Act" (approved July 1, 1862), Section 5, declares that the issue and delivery of the bonds of the United States to the company "shall *ipso facto* constitute a first mortgage on the whole line of the railroad and telegraph, together with the rolling stock, fixtures, and property of every kind and description."

Under the new Constitution there can be no doubt but this mortgage constitutes an interest in the property affected by it, and that to the extent of the debt secured by it the United States must, for the purposes of taxation, be treated as the owners of the road. The only answer which the Attorney General makes is that the road is properly assessed to the "holders of the legal title." The reply to this is that under the new Constitution the United States holds the legal title to the extent of the mortgage debt.

This interest is, by the State Constitution, exempted from taxation. Section 1, Article xiii, exempts all property which "may belong to the United States." It can neither be taxed, nor can the interest of the United States be affected by any action of the State. If it was competent to tax this interest, it would, of course, be competent to sell it for the tax. A sale for taxes followed by a deed, effectually destroys all prior liens upon the property. Hence, the reason and propriety of the exemption in question.

The mortgage to private parties also constituted, for the purposes of taxation, an interest in the mortgage property.

This interest has also been taxed to petitioner. There is no authority in law for such action. The concluding portion of Section 4, Article xiii of the State Constitution, provides a system for the taxation of the interests of mortgages, full and complete within itself, except as to " railroad and other *quasi* public corporations." As to these it is silent.

Nor are there any constitutional provisions which point out how the interest of mortgages of railroad property is to be taxed. The silence of the Constitution upon this subject is in effect its remission to the Legislature for action, and the Legislature has made no provision on the subject.

It is elementary that in the absence of law no valid tax can be made.

The Central Pacific Railroad Company is one of the means and instrumentalities selected and employed by Congress to carry into operation the powers granted to the general Government. A tax upon its franchise—upon its right to exist— is, within the meaning of all the authorities, a tax upon the means and instrumentalities of the general Government. Without the express consent of Congress, no State can impose such a tax.

On the first of July, 1862, Congress, in the exercise of powers that are not now questioned, passed "An Act to aid in the construction of a railroad and telegraph line from the Missouri River to the Pacific Ocean, and to secure to the Government the use of the same for postal, military, and other purposes." (12 U. S. Stat. 489.)

The first section of the Act names a number of persons, and declares that they, " together with five Commissioners, to be appointed by the Secretary of the Interior, and all persons who shall be or may be associated with them and their successors, are hereby created and erected into a body corporate and politic, in deed and in law, by the name, style, and title of the 'Union Pacific Railroad Company.'" The company thus created is vested with the usual and customary powers of a corporation. The corporation is then expressly authorized to construct and maintain a railroad and telegraph line upon a given line and between certain points named. The amount of the capital stock is next prescribed, and also certain rules and regulations for the government of the corpora-

tion, the management of its affairs, and the transaction of its business. Provision is also made for the election of a Board of Directors, and for the appointment of two additional directors by the President of the United States, to act as directors on the part of the Government.

The second section grants a right of way through the public lands, with the further right to take from the public lands, adjacent to the line of the road, materials of every description for the construction of the road, concluding with a promise on the part of the United States that the Indian titles to all lands falling under the operation of the Act shall be extinguished as rapidly as may be. The third section grants to the company alternate sections of land, on each side of said road, with certain reservations as to mineral lands and lands reserved, or otherwise disposed of, or to which pre-emption or homestead claims have attached. The fourth section provides, among other things, for the appointment of three Commissioners by the President, who are to examine the road, from time to time, and report to him as to the manner of its construction and the progress made therein, with a view to the issuing of patents for said lands, and that all vacancies occurring in said Board of Commissioners shall be filled by the President. The fifth section provides for the loaning of the credit of the Government, in the shape of bonds, and securing the payment thereof by a first lien upon the road and telegraph, together with all the rolling stock and other property, and concludes with a provision which has a most important bearing upon the question in hand, viz.: "And on the refusal or failure of said company to redeem said bonds, or any part of them, when required to do so by the Secretary of the Treasury, in accordance with the provisions of this Act, the said road, with all the rights, functions, immunities, and appurtenances thereunto belonging, and also all lands granted to the said company by the United States, which, at the time of said default, shall remain in the ownership of the said company, may be taken possession of by the Secretary of the Treasury, for the use and benefit of the United States." This provision is followed by another contained in the sixth section, which provides: " That the grants aforesaid are made upon condition that

said company shall pay said bonds at maturity, and shall keep said railroad and telegraph line in repair and use, and shall at all times transmit dispatches over said telegraph line, and transport mails, troops, and munitions of war, supplies and public stores upon said railroad for the Government, whenever required to do so by any department thereof, and that the Government shall at all times have the preference in the use of the same for all the purposes aforesaid." Power to consolidate with other companies named in the Act is given in the sixteenth section. The right to connect with the road is given to other companies by the fifteenth section. The President is authorized to establish a uniform width of track, so that the same cars can be run from the Missouri River to the Pacific Ocean, by the twelfth section.

The seventeenth section provides that if said company shall fail to comply with the terms and conditions of the Act, or to keep the road in repair and use for an unreasonable time, " Congress may pass any Act to insure the speedy completion of said road and branches, or put the same in repair and use, and may direct the income of said railroad and telegraph line to be thereafter devoted to the use of the United States," etc.; and further, that if said roads are not completed " so as to form a continuous line from the Missouri River to the navigable waters of the Sacramento River, by the first day of July, 1876, said roads, with all their rolling stock, fixtures, etc., shall be forfeited to and be taken possession of by the United States." The eighteenth section provides that when the net earnings of the road and telegraph shall have reached a certain per centum upon their cost, " Congress may reduce the rates of fare thereon, if unreasonable in amount, and may fix and establish the same by law, and may at any time, having due regard for the rights of said companies named herein, add to, alter, amend, or repeal this Act." Finally, by the last section, the company is required to make annual reports as to certain matters therein mentioned to the Secretary of the Treasury, for the obvious purpose of enabling the general Government to supervise and control the road and telegraph by legislation and otherwise. (12 U. S. Stat. at Large, 489.)

In respect to this question of taxation, the Pacific Railroad

Acts are upon all fours with the Act by which the Bank of the United States was established (3 U. S. Stat. at Large, 266). The plan adopted by Congress for the purpose of establishing the bank and securing its use to the Government, as a financial agent, is so similar to that adopted in the present case, as to suggest that the former served as a model for the latter. As in this instance, a corporation, with full banking powers, was created. The amount of its capital stock was fixed at thirty-five millions of dollars, of which sum the Government was to subscribe only one fifth, or seven millions, leaving twenty-eight millions to be taken by private individuals. The affairs of the bank were to be managed by twenty-five Directors, of whom twenty were to be elected by the stockholders and five to be appointed by the President of the United States, by and with the advice and consent of the Senate. The powers of the Directors and the business operations of the institution were defined and restricted. Power was given, with certain restrictions, to establish branch institutions in the several States. The Secretary of the Treasury was authorized to call upon the bank for a statement of its affairs, as often as once a week. For the privileges and benefits conferred by the charter, the President and Directors of the bank were required to pay to the United States a bonus of one million and five hundred thousand dollars, in three equal payments. And it was lastly provided that the books of the corporation should always be open to the inspection of a committee of either House of Congress, appointed for that purpose.

Contrast these provisions with those of the Railroad Act, to which reference has been made, and it will appear that the interest of the Government in the bank was much less, and the powers over its management and affairs assumed by the Government was much less sovereign than in the case of the Pacific Railroad. The interest of the Government in the bank was but five millions of dollars; to the Pacific Railroad and telegraph it has loaned sixty-three millions in bonds, and has donated thirty millions more in land. As the Government shared in the management of the bank, through directors appointed by the President, so does it share in the management of the Union Pacific, through the same means. As the Gov-

ernment was authorized to watch the operations of the bank through committees of Congress, and reports by the directors of the bank to the Secretary of the Treasury, so has it watched the construction of the railroad and telegraph, through Commissioners appointed by the President, and so has it, and does it, inspect the management and affairs of the Pacific Railroad and telegraph, through annual reports made by the directors for a time, to the Secretary of the Treasury, but latterly to the Secretary of the Interior. As the Government reserved the power to control the loans and business operations of the bank, by legislation, so has it reserved the right to fix and establish by law, fares and freights upon the Pacific Railroad. The sovereignty asserted over the bank was therefore in no respect greater than that asserted over the railroad; on the contrary, the sovereignty asserted over the railroad is far greater, in a most important particular. Nowhere in the Act by which the bank was established, was any provision made for the forfeiture of its franchises, or for taking possession of its property by the Government and administering its affairs through other agencies, or the devotion of its income and resources to the use of the United States. Yet all of these Acts, which lie upon the extreme verge of sovereign power, have been reserved by the Government in the case of the Pacific Railroad and telegraph.

It is clear that the Union Pacific Railroad Company is a national corporation, created for the benefit and use of the general Government, in the conduct and management of its postal, military, and other affairs. The relation of the Central Pacific to the general Government differs from that of the Union Pacific in one respect only. The Central Pacific was not in the first instance created a corporation by the general Government. It had become a corporation, under the laws of the State of California, prior to the passage of the Pacific Railroad Act.

By the Act of 1862, Congress conferred the same powers upon the Central Pacific which it conferred upon the Union Pacific, annexing thereto the same conditions. In the ninth section of the Act it is provided that: "The Central Pacific Railroad Company of California, a corporation existing under the laws of the State of California, are hereby authorized to

construct a railroad and telegraph line from the Pacific Coast, at or near San Francisco, or the navigable waters of the Sacramento, to the eastern boundary of California, upon the terms and conditions, in all respects, as are contained in this Act, for the construction of said railroad and telegraph line first mentioned, and to meet and connect with the first mentioned railroad and telegraph line on the eastern boundary of California."

"Again, in the tenth section, it is further provided: "And the Central Pacific Railroad Company of California, after completing its road across the State, is authorized to continue the construction of said railroad and telegraph through the territories of the United States to the Missouri river, including the branch roads specified in this Act, upon the routes hereinbefore and hereinafter indicated, on the terms and conditions provided in this Act in relation to the said Union Pacific Railroad Company, until said roads shall meet and connect, and the whole of said railroad and branches and telegraph is completed."

In Section 16 of the Act of Congress of July 2, 1864, it was provided that upon complying with certain conditions (all of which have been complied with), the Central Pacific Railroad Company "shall enjoy all the rights, privileges, and benefits conferred by this Act upon the Union Pacific Railroad Company."

It has been claimed on behalf of the Central Pacific Railroad Company—and with great plausibility—that by reason of the Acts of Congress relating to it, the general Government has converted it into a national corporation, and that in form as well as substance, it bears the same relation to the Federal Government, and to the States, as does the Union Pacific Company. It is also claimed that the State of California has assented to the adoption. That Congress intended to and supposed it had erected the Central Pacific Railroad Company into a national corporation is evident. Section 17 of the Act of 1862 provides in direct terms for a forfeiture to the United States for non-performance of conditions, of the property and franchises of that corporation. "Conditions can only be reserved to the feoffer, donor, or lessor and their heirs; but not to a stranger." It would not be competent for Congress to

provide for the forfeiture of the franchises of a State corporation to the national government for non-performance of conditions, nor to provide for the entry of the United States for such conditions broken, for "he who enters for conditions broken shall be in of the same estate he was before." (*Wiseman* v. *McNulty*, 25 Cal. 239.)

But whether it be true or not that the Central Pacific Railroad Company has in form been made a federal corporation, I shall not stop to inquire. The question whether it is or is not a federal corporation is of minor importance. Corporation or no corporation is not a factor in the solution of the problem.

The exemption is not claimed upon the ground that it is a federal corporation, but upon the ground that by the unquestioned Act of Congress it has been selected as a means and instrument of the general Government to carry into execution the admitted powers of that Government. It was authorized to construct and operate a railroad and telegraph line upon the same "terms and conditions in all respects" as the Union Pacific.

These "terms and conditions" constitute the tests whether or not it has been made an instrument of the general Government. It is useless, at this point, to speculate upon the reasons which led to the enactment of the law of 1862, or what were the purposes had in view; for Congress has declared the reason and purpose in the title of the Act to be to "secure to the Government the use" of a railroad from the Missouri River to the Pacific Ocean "for postal, military, and other purposes." To effectuate that purpose, Congress created a corporation known as the Union Pacific Railroad Company, and adopted the Central Pacific Railroad Company, and to these corporations, upon the same terms and conditions, intrusted the execution of its purposes. The two companies were charged by Congress with the speedy construction of the road and telegraph line. It was made their duty, when completed, to keep the same in repair and use, so that upon demand of the Government they could transmit its dispatches over the telegraph line and transport its mails, troops, munitions of war, supplies and public stores upon the railroad. To the end that these companies might be in con-

dition to perform these great governmental functions, aids in lands and bonds were granted; and that they might maintain and operate the vast machine intrusted to their care and be ready at all times to give to the Government its aid in peace and in war, without too great a charge upon the public treasury, they were authorized to transact business for private parties, but were required at all times to subordinate such business to the public duties cast upon them. The Government "must at all times have the preference." At all times both companies are subject to the orders of the general Government, and must, at its command, devote themselves to the performance of their governmental functions to the absolute exclusion of all other business. Not more absolute is the control of the general Government over the officer who commands its steam frigates, than is its control over the agents who constructed and who manage the transcontinental roads. It may, for the purposes of his creation, control every public and official action of a captain in the navy. All this it may do with these corporations, and even more, for it may control their relations with private parties and regulate the terms and conditions upon which they can transact their private affairs. Congress has employed these corporations as a means to carry its powers into execution. Can the State Governments destroy either? This is the question, upon the solution of which depends the validity or invalidity of the State tax sought to be imposed upon the franchise, or the right to exist, of the Central Pacific Railroad Company.

The power to create implies the power to preserve. The power to destroy, if wielded by a different hand, is hostile to and incompatible with the power to create and preserve. Where that repugnancy exists, that authority which is supreme must control, not yield to that over which it is supreme. "These propositions as abstract truths," says Chief Justice Marshall (*McCulloch* v. *Maryland*, 4 Wheat. 426), "would, perhaps, never be controverted."

Are these propositions applicable to the case in hand? Let us consider them separately, and in the order of inquiry the first will be: Had Congress the power to select the Central Pacific Railroad Company and create it an agent of the general Government—to make it one of the means or instru-

ments for the construction of a transcontinental railway and telegraph, and one of the means or instrumentalities by which the use of the same for postal, military, and other purposes could be secured to the Government?

At this late date no argument would seem to be necessary to maintain that Congress possessed such powers. The Federal Constitution expressly confers upon Congress the power among others to provide for the common defense and general welfare of the United States; to establish postroads; to declare and carry on war; and to make all laws which shall be necessary and proper for carrying into execution the powers granted. With respect to the means by which the powers it confers are to be executed, the Constitution has been construed to allow to Congress that discretion which will enable it to perform the high duties assigned in the manner most beneficial. After Congress has acted it is not for the Courts to determine whether the means selected are the best possible. Such considerations are for Congress alone. If the end be legitimate; if it be within the scope of the Constitution, then all means which are plainly adapted to that end, whether better ones could be found or not, may be constitutionally used by Congress. (*McCulloch* v. *Maryland,* 4 Wheat. 421.)

We have seen that the declared purpose of Congress in providing for the construction of the transcontinental railway and telegraph was to " promote the public interest and welfare by the construction of said railroad and telegraph line, and keeping the same in working order, and to secure to the Government at all times (but particularly in time of war), the use and benefits of the same for postal, military, and other purposes." Was the end a legitimate one? Was it within the scope of the Constitution? In the progress of science railways have become mighty engines in the prosecution of military enterprises. Indeed, their use may be said to have almost revolutionized the art of war. Not only are they proper means if the end be war, but they are admittedly necessary means, without which no civilized nation would attempt to carry on warfare with another. This being so, then Congress would have the right to construct and to maintain them to subserve the public welfare. The power to construct and maintain necessarily includes the power to·

determine the mode and means of construction and maintenance, and to select the instruments to keep the same in working order. In making this determination, Congress created a corporation to construct and maintain the eastern section, and adopted a corporation already in existence to construct and maintain the western section. As to both sections the object of Congress was the same. To authorize some person to construct the road and to impose upon the persons authorized the duty of keeping it in repair and use, so that, whenever required, the "mails, troops, and munitions of war" of the government could be transported over it, and, if necessary, to the exclusion of all other traffic. This was the great purpose and object of the Government, and in this purpose and object Congress found the constitutional authority to act in the premises. The end was not to create one corporation nor to adopt another, but was to create agents, or instrumentalities and means through which the governmental function involved could be exercised. It created one corporation, and made of it such an instrument of its power. It found another corporation in existence and made it the means by which the power should, in part, be executed. Congress seized upon a State corporation and made it the instrument to execute its will. Congress, by law, gave it the right of way over the public lands; the right to contract debts and secure them by mortgage; the right to take and hold property; the right to build railroads in the Territories of the United States; the right to make contracts; the right to maintain ferries over navigable waters; the right to eminent domain; the right to consolidate with other corporations, and to adopt and use thereafter a corporate name, and to enjoy all the rights, privileges, and benefits conferred upon the Union Pacific.

Congress, by law, made it the duty of the Central Pacific Railroad Company to keep the road and telegraph in repair and use; to transmit, on demand, dispatches, mails, troops, and munitions of war for the Government, and reserved the right to regulate freights and fares—to enter for condition broken, and to alter, amend, and repeal. These rights, privileges, powers, and duties, conferred and imposed, make the instrument to bear a wonderful resemblance to a federal cor-

poration. In these times Courts deal more with substance and less with form in construing laws, and when we remember that no particular form of words or mode of expression is necessary to the creation of a corporation, it is difficult to conceive that Congress intended less than the creation of a federal corporation. But it is not the name which the instrument bears, but the faculties with which it is endowed and the purposes for which it is used, which gives it immunity. All the rights and privileges above enumerated, all the rights and privileges which the Union Pacific enjoy, are conferred upon the Central Pacific by the laws of the Federal Government. That the Central Pacific Railroad Company is an agent of the Government precisely as the Union Pacific Company is, to the same extent, and for the same purposes, is not an open question. Such is the judgment of the Supreme Court of the United States. (*Railroad Company* v. *Peniston*, 18 Wall. 32.)

No one has ever seriously questioned the power of Congress to enact the laws in question, and we may safely assume that Congress, " to promote the public interest and welfare, * * * to secure to the Government at all times, the use and benefit of the transcontinental road and telegraph," had the right to select the Central Pacific Railroad Company as an instrument, clothe it with the privileges and immunities given by law, and place it in charge of the western section of that road and telegraph line. Can the State destroy this agent? No one would have the temerity to contend that a State could repeal the laws which confer upon the Central Pacific its character as a national agent. Whatever Congress has the power to do the individual States have no right to undo. Its power to select an agent and place it in charge of the machinery of war, like its other sovereign powers, is supreme, or it would be nothing. As Mr. Pinckney aptly remarks (*McCulloch* v. *Maryland*, 4 Wheat. 391): "A power to build up what another may pull down at pleasure is a power which can provoke a smile, but which can do nothing else." If the State can not repeal the Acts of Congress under which this corporation now exercises all its functions, it can not by indirection accomplish the same purpose. This agent chosen by the Federal Government must continue to exist, enjoy its priv-

ileges and immunities, and perform its obligations so long as that Government wills. A constitutional law enacted by Congress to carry into execution the powers vested in the general Government confers the privileges and immunities, and imposes the obligations, and no State can in any manner retard, impede, burden, or control the operation of that law. (*McCulloch* v. *Maryland,* 4 Wheat. 316; *Osborn* v. *Bank of United States,* 9 Id. 738; *Weston* v. *City of Charleston,* 2 Pet. 466.) This, says Chief Justice Marshall (*McCulloch* v. *Maryland,* 4 Wheat. 436), is "the unavoidable consequence of that supremacy which the Constitution has declared." And again (p. 425): "A law absolutely repugnant to another, as entirely repeals that other as if express terms of repeal were used."

The power of the State to tax the franchise—the right to exist—of the Central Pacific Railroad Company is incompatible with the power of the Federal Government to adopt and use it as a governmental agent or instrument.

The transcontinental road, dedicated now chiefly to the promotion of the arts of peace, was born in war. It is true that a few of the prominent men of the nation had long looked forward to such a work; and that the people of California, forming an isolated community, had as early as May 1, 1852, through their Legislature, declared "that the interests of this State, as well as those of the whole Union, require the immediate action of the Government of the United States for the construction of a national thoroughfare connecting the navigable waters of the Atlantic and Pacific Oceans, for the purposes of national safety in the event of war, and to promote the highest commercial interests of the Republic," and granted the right of way through the State to the United States for the purpose of constructing such a road. (Stats. Cal., 1852, p. 150.) Again, in 1859, the Legislature passed a resolution calling a convention "to consider the refusal of Congress to take efficient measures for the construction of a railroad from the Atlantic States to the Pacific, and to adopt measures whereby the building of said railroad can be accomplished." (Stats. Cal., 1859, p. 391.) And at the same session the Legislature memorialized Congress to pass a law authorizing the construction of such a road, and asking that lands be granted in aid thereof. (Stats. 1859, p. 395.)

These various measures of the State of California are referred to to show that in the judgment of the State the work was a proper one for the Federal Government, and national in its character. But nothing came of these acts and resolves. It was only when war, in fact, was at hand, that the National Government moved in the premises.

We have seen that the State of California had uniformly characterized the work as a national one. That Congress declared the purpose of the Act of 1862 to be " to promote the public welfare by the construction of said railroad and tele- graph line, and keeping the same in working order, and to secure to the Government at all times, but particularly in time of war, the use and benefit of the same for postal and military and other purposes." (§ 18, Act of 1862.) Here, then, we have the declaration of the legislative department of both State and Federal Government, that the paramount purpose of the road is a national one; and that the means by which it was to be constructed and used were national means. We come now to consider how the judicial department of the Federal Government has construed the Pacific Railroad Acts, and what that department has said upon the question— whether the transcontinental road is a national machine, and the persons in charge of it agents of the Federal Government, to carry into execution its lawful purposes—whether or not such persons have been selected by the general Government as means to the ends sought to be attained by the Pacific Railroad Acts. (*United States* v. *Union Pacific R. R. Co.*, 91 U. S. 79.)

The object was "protection to the people" of the Pacific Coast. The road was viewed as " a national undertaking for a national purpose." It was a "military necessity." The project " was not conceived for private ends." It "originated in national necessities." "Profit to individuals" was comtemplated, "but this consideration does not in itself change the relation of the parties." The "primary object of the Government was to advance its own interests." Individual cooperation was an incident—" a means to an end." That end " the securing of a road which could be used for national purposes." The Central Pacific Railroad Company was one of the "means" which Congress selected to secure the end.

Congress charged it with the construction and maintenance of the road, gave it command of a national instrument, and the question now is: Does that corporation, in the economy of government, rank with and enjoy the immunities of the Captain of a revenue cutter " on the Erie Station" ?

The Union Pacific Railway Company, Eastern Division, is the corporation mentioned in Section 9 of the Railroad Act of 1862, as the " Leavenworth, Pawnee, and Western Railroad Company of Kansas." It was chartered by the Legislature of the Territory of Kansas, and subsequently by the State of Kansas. The Pacific Railroad Act of 1862 constituted it one of the companies which, in connection with the Union Pacific and Central Pacific, was to construct and maintain the transcontinental road. To the Union Pacific Railroad, chartered by Congress, it bears the same relation as the Central Pacific, with this exception, that the provisions in the Act of 1864, Section 16, which provides that the Central Pacific Railroad Company shall " enjoy all the rights, privileges, and benefits conferred by this Act upon the said Union Pacific Railroad Company," had no application to the Kansas Company. After the road was completed through the State of Kansas, the Legislature passed a law, laying certain taxes upon the tangible property of the company within the jurisdiction of the State. The payment of these taxes was resisted by the company, upon the ground that it was an agent of the general Government, and that a tax upon its property would retard, impede, burden, and control the company in the discharge of its duties and obligations to the Federal Government. The issue thus made came before the Supreme Court of the United States for determination in *Thomson* v. *The Pacific R. R.* (9 Wall. 579). The question for determination, as stated by the Court, was: " Can the right of this road to exemption from such taxation (*i. e.*, upon its tangible property) be maintained, in the absence of any legislation by Congress to that effect?" (p. 589.) The Court, after reviewing the various cases bearing upon the question, say: " We fully recognize the soundness of the doctrine that no State has a right to tax the means employed by the Government of the Union for the execution of its powers, but we think there is a clear distinction between a means employed by the

Government, and the property of agents employed by the Government. Taxation of the agency is taxation of the means; taxation of the property of the agent is not always nor generally taxation of the means." (p. 691.) And in the case then in judgment, the Court determined that the tax levied by the State of Kansas being upon the property, and not upon the agency itself, was not within the immunity, and the Act of the Legislature · of the State of Kansas was constitutional, and could be enforced. Some expressions in the opinion delivered by the Chief Justice in the case just cited, led to the belief that the Court might maintain that there was a distinction between the property of the agent, if that agent was a State corporation, and the property of the agent, when that agent was a Federal corporation.

But in the case of *The Railroad Company* v. *Peniston,* 18 Wall. 5, it was held that no such distinction existed, and that the question was not whether it was a Federal or State corporation, but that the immunity rested upon the fact that the person or corporation claiming it had been selected by the general Government as an agent in the execution of its powers. In that case the tax involved was one laid by the State of Nebraska upon the tangible property of the Union Pacific Railroad Company, a corporation created by Congress. The Court in its opinion refers to the case of *Thomson* v. *Union Pacific R. R. Co.,* 9 Wall. 579, and says: " It is true that in the opinion delivered by the Chief Justice, reference was made to the fact that the defendants were a State corporation, and an argument was attempted to be drawn from this to distinguish the case from *McCulloch* v. *The State of Maryland* " (p. 436). " But," says the Court, "when the case is as in the present case, whether the taxation of property is a taxation of means, instruments, or agencies by which the United States carries out its powers, it is impossible to see how it can be pertinent to inquire whence the property originated, or from whom its present owners obtained it. The United States have no more ownership of the road authorized by Congress than they have in the road authorized by Kansas. If the taxation of either is unlawful, it is because the State can not obstruct the exercise of national powers" (p. 34). "There is no difference which can be pointed out between the nature, extent, or pur-

poses of their agency and those of the corporation complainants in this particular case" (p. 33).

"As was said in *Weston* v. *Charleston* (2 Pet. 466), they (the States) can not by taxation or otherwise, retard, impede, burden, or in any manner control the operation of the constitutional laws enacted by Congress to carry into execution the powers vested in the general Government. The implied inhibition, if any exists, is against such obstruction, and that must be the same, whether the corporation whose property is taxed was created by Congress or by a State Legislature."

Reference is then made by the Court to the fact that in *McCulloch* v. *Maryland* (4 Wheat. 436), the tax was upon the operation of the agent; that in the case of *Osborn* v. *The Bank of the United States* (9 id. 738), the tax was upon its right to transact business, and that a clear distinction was taken between the right of a State to tax the operation or existence of the agent, and a right to tax its tangible property within the jurisdiction of the State, and this distinction, says the Court, "so clearly drawn in the earlier decisions between a tax on the property of a governmental agent and a tax upon the operation of such agent, or upon his right to be, has ever since been recognized" (p. 36).

The cases last cited are in harmony with the earlier decisions, and also with the principle laid down in the case of the *Collector* v. *Day*, 11 Wall. 127.

In no subsequent case has the force of their reasoning or the weight of the authority of the cases of *McCulloch* v. *Maryland*, and *Osborn* v. *The Bank of the United States*, been in the least abated, but on the contrary the principles established in those cases stand unbroken and impregnable.

In the *Railroad Company* v. *Peniston* (18 Wall. 5), the Supreme Court by the clearest implication, maintain that if the tax complained of in *Thomson* v. *U. P. R. R. Co.*, or the *Railroad Company* v. *Peniston*, had been imposed upon the franchise—the right of the company to exist—it would have been not a tax within the province of the State Government to :impose, but one prohibited by the Constitution of the United States. While upon this question the Court is unanimous, a majority determined that the tangible property of the companies, parties to those suits, was not within the

immunity claimed, but the Court divided nearly evenly, the minority holding that the exemption extended not only to the existence and being of the agent, but to all of its property within the States.

We have in this argument treated the Central Pacific Railroad Company as a corporation deriving its powers from the State alone. This is not true in point of fact; so far as it was organized under State laws it was with a capital of eight million five hundred thousand dollars, and to build a road from Sacramento City to the eastern boundary of California, a distance of one hundred and fifteen miles. Under the operation of its California charter it could only borrow money to an amount not exceeding its capital stock, and must provide a sinking fund for the ultimate redemption of its bonds. The State granted no power to build any road except from Sacramento to the State line. By the Railroad Act of 1862 Congress granted it the right to build a road and telegraph line from San Francisco to the eastern boundary line of the State, and thence through the territories of the United States until it met the road and telegraph line of the Union Pacific Company, and gave to it other privileges and immunities of a corporate character, which have been heretofore enumerated. In the Sinking Fund cases (99 U. S. 727, 728, 729), the Supreme Court of the United States, referring to the Central Pacific Railroad Company, expressly determine that these things were "additions" to the corporate power of the company, and say that "but for the corporate powers and financial aid granted by Congress, it is not probable the road would have been built." It was in this grant of corporate powers, franchises, and immunities by Congress that the Court rested the authority of Congress to enact the "Thurman Bill" into a law.

If this Court should hold that the immunity from taxation is in any degree dependent upon the source from which the corporate powers emanated, we have in the "Sinking Fund cases" the authoritative announcement of the Supreme Court of the United States that the franchise of the Central Pacific Railroad Company in part finds its source in Congressional enactment, and that to the extent of the powers so conferred the franchise is a Federal franchise. This alone would render

any scheme of State taxation of the franchise impracticable. How is that part of the franchise granted by the State to be segregated from that part granted. by the general Government? Which part of the life of this being is at the mercy of the State? Upon which member of its body may the State Tax Collector execute his judgment of death? These would be pertinent questions if an attempt in this view of the case had been made to assess and tax part of the franchise of the company. But no such attempt has been made. The paltry considerations of "mine and thine" have not agitated the State Board of Equalization, but with characteristic audacity it has seized upon the whole.

The attempt of the State of California to levy a tax upon the existence of an agent of the National Government is a clear case of usurpation—an open defiance of the supremacy of the Federal Government as maintained in every adjudication made by the Supreme Court of the United States upon the subject.

*A. L. Hart*, Attorney General, for Respondent.

Petitioner was not entitled to have any reduction on account of the existence of the mortgage against its road. The Constitution provides a different mode in making assessment of railroad property incumbered by mortgage than of other property so incumbered. It is provided that "except as to railroad and other *quasi* public corporations, in case of debts so secured, the value of the property affected by such mortgage, deed of trust, contract, or obligation, less the value of such security, shall be assessed and taxed to the owner of the property, and the value of such security shall be assessed and taxed to the owner thereof, in the county, city, or district, in which the property affected thereby is situate." (Art. xiii, § 4.) The above provision seems too plain to admit of construction. If in all cases "except as to railroads," etc., a deduction of the value of the security is to be made, it follows from an elementary rule of construction that, as to the exceptions made, no such deduction is to be allowed; or, in other words, in the case of a railroad, the entire value is to be assessed against the owner of the road, regardless of the question whether or not a mortgage or like incumbrance exists against

the road. "All property in the State, not exempt under the laws of the United States, shall be taxed in proportion to its value, to be ascertained as provided by law." (Art. xiii, Section 1.) If the railroad of petitioner is to be taxed at its value, as provided in Section 1, and if the incumbrance existing against said railroad is not to be assessed to the owner of the security, the unavoidable inference follows: that the entire value of the railroad is to be assessed against the owner—the holder of the legal title to the road.

The power to make the said assessment, and to apportion the same, is clearly conferred upon the State Board of Equalization by Section 10 of Article xiii of the State Constitution, and that section is self-executing. (*People* v. *Supervisors of Sacramento County*, 8 P. C. L. J. 103.)

It is argued by petitioner, however, that the foregoing provision of the Constitution is in conflict with the Constitution of the United States, because, as is alleged by petitioner, no provision is made permitting the owner of a railroad, operated in more than one county, to obtain a reduction or equalization of its assessment by the local Boards of Equalization; that the railroad company is thus denied a privilege accorded to the owners of every other kind of property; and in support of this position, reliance is placed by petitioner upon that portion of Section 1 of the Fourteenth Amendment to the Constitution of the United States, which provides that "No State shall * * * deny to any person within its jurisdiction the equal protection of the laws."

The vice of this argument is, that it is based upon the assumption that no provision is made in the Constitution for the equalization of assessments made by the State Board of Equalization, when in fact such provision is clearly and unquestionably made.

Section 9, of Article xiii, provides that the "State and County Boards of Equalization are hereby authorized and empowered, under such rules of notice as the County Boards may prescribe as to the county assessments, and under such rules of notice as the State Board may prescribe as to the action of the State Board, to increase or lower the entire assessment roll, or any assessment contained therein."

In assessing railroad property the State Board of Equaliza-

tion acts primarily, not as an equalizing, but as an assessing Board. The object of the framers of the Constitution, as clearly evidenced by Section 10 of Article xiii, was to provide a means of ascertaining the value of a railroad, as such, and taken as a whole, without being put to the necessity of assessing the value of its several parts or elements. Where the road is located entirely in one county, such a valuation may be made by the local authorities; but wherever the road runs through more than one county, some portion of the property extending beyond the local jurisdiction of the authorities of either of the counties through which it runs, the assessment, in order that it may cover the value as an entirety, must of necessity be made by the State Board, whose jurisdiction extends throughout all the counties. The reason for desiring the assessment of the value of the road as a whole is obvious. Railroads, like all other property, possess a value for the purposes for which they may be used, and for none other; railroads are valuable for purposes of transportation, and in proportion to the profits which they are capable of producing. The value of such property is but slightly affected by the character of the land over which the roads run, or by the nature of the materials out of which they are constructed. The value of such property may be, and ordinarily is, determined by its location and its surroundings—by the amount of carrying trade it receives on account of the settled condition and population of the country to, from, and through which it runs. A part of a valuable road, if isolated from the balance, might possess no value.

The primary object of the framers of the Constitution was to arrive at the true value of the property of such railroads in each county; the means adopted was first to ascertain the whole value of the road, and then to divide or apportion the said value among all the counties in proportion to the number of miles of railroad in each county. By the method thus adopted the value of the railroad in each county is assessed for purposes of taxation, and this valuation, together with a proper description of the property, is entered upon the assessment roll of the county. (Pol. C., § 3664.)

The only difference between the assessment of this and of other kinds of property, that can be found in the Consti-

tution, is, that the value of the one is primarily determined by the State Board of Equalization, while the other is assessed by the County Assessors and other local authorities. All the assessments so made may be eventually equalized by the State Board of Equalization. Assessments of railroads, as of all other kinds of property, go upon the county assessment roll for the purposes of State and county taxation.

The language of Section 9 of Article xiii, conferring upon the Boards of Equalization the power to equalize by raising or lowering the "entire assessment roll, or any assessment contained therein," is sufficient, therefore, to cover assessments of the character herein complained of. Plainer or less ambiguous language could not have been used to express the will of the people; and in whatever manner the powers conferred by that section may be distributed, it can not be denied that the sum total of all the powers possessed by both the Boards extend to the equalization of all kinds and classes of property, whether it belong to persons or to corporations. The object of the provision was to give to all property owners an opportunity to be heard as to the justice of the assessments made upon their property. The language of the section is such as to confer upon the several Boards general powers in matters relating to equalization. The rule established is a just and equitable one, and it is respectfully insisted that the Court should not, by mere construction or implication, place upon powers a limitation which must result in inequality or injustice.

The two Boards of Equalization, according to the language of the Constitution, have the power to equalize all assessments in the roll; and it is a rule, that when the language of the Constitution is unambiguous, no construction should be given to it which is opposed to the express words of the instrument. (*Bourland* v. *Hildreth*, 26 Cal. 161; *French* v. *Teschemaker*, 24 id. 518.)

The provision of the Fourteenth Amendment, relied on, that no State shall deny to any person the equal protection of its laws, is, we claim, only to be applied to the ultimate result to be attained, not to the method of procedure by which such result is arrived at. When applied to the case under discussion, it can not well be said that the State Constitution

denies to petitioner the equal protection of the law, if, in fact, a system is provided by which a fair and equitable assessment for the purposes of taxation is made of the property of petitioner, as compared with other property in the State.

It results that the State Board had the power, under the Constitution, to assess the property of the petitioner, and any error committed by that Board, whether of law or of fact, was committed in the exercise of an exclusive jurisdiction conferred by the organic law.

McKinstry, J.:

In addition to the points made in *San Francisco and North Pacific Railroad Company* v. *The State Board of Equalization*, the petitioner makes the following: 1. The whole of the road within this State has, by respondent, been assessed to petitioner; 2. The State Board, in making the assessment and apportionment, did not pursue the authority conferred by the State Constitution; 3. The Central Pacific Railroad is one of the means and instrumentalities employed by Congress to carry into operation the powers granted to the general Government. A tax upon its franchise—upon its right to exist—is, within the meaning of all the authorities, a tax upon the means and instrumentalities of the general Government. Without the express consent of Congress, no State can impose such a tax.

1. It is said that the Board had power only to assess the value of the real property of petitioner, less the amount of bonds issued to the company, which, by the "Railroad Act" of July 1, 1862, it is declared "shall *ipso facto* constitute a first *mortgage* on the whole line of the railroad and telegraph, together with the rolling stock, fixtures, and property."

The State Constitution declares: "A mortgage, deed of trust, contract, or other obligation by which a debt is secured, shall, for the purposes of assessment and taxation, be deemed and treated as an interest in the property affected thereby." (§ 4, Art. xiii.) But the same section proceeds: "*Except* as to railroad and other *quasi* public corporations, in case of debts so secured, the value of the property affected by each mortgage, deed of trust, contract, or obligation, less the value

of such security, shall be assessed and taxed to the owner of the property, and the value of such security shall be assessed and taxed to the owner thereof, in the county, city, or district in which the property affected thereby is situate."

Reading the whole section it seems very plain that as to mortgages, deeds of trust, contracts, or other obligations secured upon the property of railroad and other *quasi* public corporations, they should not be deemed and treated as an interest in the property affected by them "for the purposes of taxation."

Under the Constitution of this State the property of such corporations is subject to assessment and taxation, without deduction of the amount of any mortgage or like lien thereon. The meaning is made clearer by the language "shall be assessed and taxed in the county, city, or district" in which the property is situate. By reason of Section 10, Article xiii, the property of railroads "operated in more than one county" *can not* be assessed in the counties, but *must* be assessed only by the State Board of Equalization.

The claim is, that thus to impose upon railroad corporations, operated in more than one county, a tax upon the full value of their property, while upon owners of other property is imposed a tax only upon the value of their property after deducting the amount of mortgage and other like liens, is to deny to such corporations the "equal protection of the laws," and therefore violative of the Fourteenth Amendment to the Constitution of the United States.

It may be urged that there is no practicable difference between taxing the railroad corporations at a higher rate or percentage upon the value of their property than is assessed upon the property of others, and establishing a mode of estimating the value of their property which results in the payment by them of more than is paid upon like property by others. But, if this be true, are the provisions of the State Constitution in conflict with the Fourteenth Amendment of the Constitution of the United States?

"The power to tax is the strongest and most pervading of all the powers of government." (Miller, J., in *Loan Association* v. *Topeka*, 20 Wall. 655.) No limitations or restrictions upon this essential attribute of government can be raised by

implication; but the intention to limit or abridge it must be expressed in clear and unambiguous language. (*Lane County v. Oregon,* 7 Wall. 71; *Munn* v. *Illinois,* 94 U. S. 123.)

In *The Insurance Company* v. *The City of New Orleans,* it was held that an ordinance which levied a tax upon foreign corporations double that levied upon domestic corporations was not in conflict with the Fourteenth Amendment. The United States Circuit Judge said: "Are corporations within the meaning of the amendment? The word *person* occurs three times in the first section, in the following connections: 'All *persons* born or naturalized in the United States;' 'nor shall any State deprive any *person* of life, liberty, or property,' etc.; · 'nor' shall any State 'deny to any *person* the equal protection of the laws.' The complainants claim that this last clause applies to corporations—artificial persons.

"Only natural persons can be born or naturalized; only natural persons can be deprived of life or liberty; so that it is clear that artificial persons are excluded from the provisions of the first two clauses just quoted. If we adopt the construction claimed by complainants, we must hold that the word 'person,' when it occurs the third time in this section, has a wider and more comprehensive meaning than in the other clauses of the section where it occurs. This would be a construction for which we find no warrant in the rules of interpretation. The plain and evident meaning of the section is, that the persons to whom the equal protection of the law is secured are persons born or naturalized or endowed with life and liberty, and consequently natural, not artificial persons." (1 Wood, 85.)

2. The State Board of Equalization performs its function, with reference to the property of railroad corporations, by making the assessments of all such properties accord with the standard of "actual value." Section 9, of Article xiii of the Constitution has no relation to the assessments of the property of railroad corporations, operated in more than one county. (§ 10, Art. xiii.)

3. The petitioner derives its franchise, "its right to exist," solely from and under the laws of the State. When it ceases to exercise all the privileges thus derived (assuming that it may, of its own option, abandon them, and, at the

same time, relieve itself of the duties and obligations necessarily joined with them), it may, perhaps, be in a position to contest the right of the State to tax the moneyed value of the franchise, as actually employed and in connection with the property acquired and held by means of the powers conferred with the franchise. The franchise, at least in such connection, is *property* subject to taxation.

We are not required now to decide whether the Congress of the United States has power to exempt from State taxation the property of a corporation created by, or organized under the laws of a State; or whether a corporation, the creature of a State law, can, by entering into contract relations with the general Government, withdraw itself from obligations to its creator—obligations which are essential elements of its existence.

For the purposes of the case at bar it may be admitted (in the language of counsel) that the Government of the United States can "seize upon" the railroad and rolling stock of a corporation, chartered by a State, as the "means or instrumentality" for carrying into operation a power of that Government, and that it can prohibit taxation by the State of the property thus seized. Admitting all this, there is nothing in *McCulloch* v. *Maryland,* 4 Wheat. 316, or in the other cases cited by petitioner, which lays down a rule necessarily subversive of the provisions of the State Constitution.

In *Thomson* v. *Pacific Railroad,* 9 Wall. 587, Chief Justice Chase said: "The main argument for plaintiff is, that the road, being constructed under the direction and authority of Congress, for the uses and purposes of the United States, and being a part of a system of roads thus constructed, is, therefore, exempt from taxation under State authority. It is to be observed that this exemption is not claimed *under any Act of Congress.* It is not asserted that any Act declaring such exemption has received the sanction of the national Legislature. But it is earnestly insisted that the right of exemption arises from the relations of the road to the general Government. It is urged that the aids granted by Congress to the road were granted in the exercise of its constitutional powers to regulate commerce, to establish post-offices and post roads, to raise and support armies, and to suppress in-

surrection and invasion; and that by the legislation which
supplied aid, required security, imposed duties, and finally ex-
acted, upon a certain contingency, a percentage of income, the
road was adopted as an instrument of Government, and as
such was not subject to taxation by the State."

After pointing out the wide difference between the case
then under consideration and *McCulloch* v. *Maryland,* the
learned Chief Justice proceeded: "We do not doubt, however,
that upon the principles settled in that judgment, Congress
may, in the exercise of powers incidental to the express
powers mentioned by counsel, make or authorize contracts
with individuals or corporations for services to the Govern-
ment; may grant aids by money or land, in preparation for,
or in the performance of such services; may make any stipu-
lation and conditions in relation to such aids not contrary to
the Constitution; and may exempt, in its discretion, the
agencies employed in such services from any State taxation
which will really prevent or impede the performance of them.

"But can the right of this road to exemption from such
taxation be maintained in the absence of any legislation by
Congress to that effect?

"It is unquestionably true that the Court, in determining
the second general question, already stated, did hold that the
Bank of the United States, with its branches, was exempt
from taxation by the State of Maryland, although no express
exemption was found in the charter. But it must be remem-
bered that the Bank of the United States was a corporation
created by the United States; and, as an agent in the execu-
tion of the constitutional powers of the government, was en-
dowed by the act of creation with all its faculties, powers,
and functions. It did not owe its existence, or any of its
qualities to State legislation. And its exemption from taxa-
tion was *put upon this ground.*" * * * ".That such
(State) taxes can not be imposed on the operations of the
Government, is a proposition which needs no argument to
support it. And the same reasoning will apply to instru-
ments of the Government, *created by itself,* for public and
constitutional ends. But we are not aware of any case in
which the real estate or other property of a corporation, not
organized under an act of Congress, has been held to be

exempt, in the absence of express legislation to that effect, to just contribution, in common with other property, to the general expenditure for the common benefit, because of the employment of the corporation in the service of the government."

"No one questions that the power to tax all property, business, and persons, within their respective limits, is original in the States, and has never been surrendered. It can not be so used, indeed, as to destroy or hinder the operations of the National Government; but it will be safe to conclude, in general, in reference to persons and State corporations employed in Government service, that when Congress has not interposed to protect their property from State taxation, such taxation is not obnoxious to that objection."

"We perceive no limit to the principle of exemption which the complainant seeks to establish. It would remove from the reach of State taxation all the property of every agent of the Government. Every corporation engaged in the transportation of the mails, or of Government property of any description, by land or water, or in supplying materials for the use of the Government, or in performing any service of whatever kind, might claim the benefit of the exemption," etc.

Orders affirmed.

Ross and McKEE, JJ., concurred.